# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WORLD CLASS WHOLESALE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. N17C-05-093 MMJ [CCLD] |
| v. | ) | |
| | ) | |
| STAR INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: December 13, 2019
Decided: March 5, 2020

On Plaintiff's Post-Trial Motion

## POST-TRIAL OPINION

John G. Harris, Esq., Berger Harris LLP, Wilmington, Delaware, *Attorneys for Plaintiff*

Adam L. Balick, Esq., Melony Anderson, Esq., Balick & Balick, LLC, Wilmington, Delaware, *Attorneys for Defendant*

**JOHNSTON, J.**

World Class Wholesale, LLC ("WCW") brought this action against Star Industries, Inc., ("Star") for breach of an oral contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment. WCW requested compensatory, consequential, and punitive damages.

A bench trial was held before this Court on August 15, 16 and 19, 2019. WCW submitted a post-trial brief on October 24, 2019. Star submitted its

1

answering brief on November 25, 2019.  WCW filed its reply on December 13, 2019.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having presided at the trial in this case, the Court makes the following findings.  Star is a New York-based supplier of alcoholic beverages.[1]  Star became a Delaware-licensed supplier in 2009.[2]  Prior to February 2014, Star's Delaware distributor was Global Fine Wines and Spirits ("Global").[3]

WCW is a licensed Delaware-based wholesaler and Delaware Limited Liability Company.[4]  WCW is owned through an irrevocable trust by Christopher J. Tigani.[5]  Tigani also serves as WCW's President.

On February 28, 2014, WCW entered into a Letter Agreement with Global, pursuant to which WCW purchased all of Global's inventory of Star products (for a purchase price of $52,966.74) and the rights to distribute Star products in Delaware (for $50,000).[6]  Star began working with WCW as its Delaware wholesaler in March 2014.

---

[1] Ans. Br. at 4.
[2] *Id.*
[3] *Id.* at 4.
[4] Am. Compl. ¶ 19.
[5] *Id.* ¶ 29.
[6] JX 2.

2

Star became concerned following what appeared to be recurring issues with WCW's trucking company,[7] late payments,[8] and inadequate level of distribution.[9] WCW sent two checks totaling over $70,000 to Star as payment for delivered inventory. Both checks bounced.[10] WCW was unable to pay Star for the delivered inventory.[11] During this time period, Star delivered additional inventory to WCW. At one point, WCW received from Star over $220,000 worth of Star products for which WCW had not paid and of which $175,000 was overdue.[12]

WCW alleges that Star had unilaterally cut off WCW's credit arrangement following these payment issues.[13] Star alleges that WCW had agreed to the change in payment terms following the payment problems.[14]

In November 2016, the parties entered into a Payment Agreement to resolve the dispute over WCW's failure to pay Star for inventory.[15] Pursuant to that agreement, WCW had until December 3, 2016 to pay its outstanding balance in full.[16] WCW further agreed that "[o]nce payment is made, the parties will then

---

[7] Tr. Vol. II at 24:2–19; JX 135.
[8] *Id.* at 15:14–18:8; JX 86, 87, 136.
[9] *Id.* at 27:7–29:21.
[10] JX 119.
[11] Tr. Vol. II at 40:17–22.
[12] JX 183.
[13] Op. Br. 26.
[14] JX 145, 101.
[15] *Id.* at 145.
[16] *Id.* at 1.

3

have a good faith discussion about the business terms under which [WCW] may order and pay for Star's products going forward."[17]

WCW complied with its obligations under the Payment Agreement, as did Star. Following the last payment due under the Payment Agreement, Star and WCW engaged in discussion. Star alleges that the parties agreed that WCW would make two-day advance payment for any new purchase orders.[18]

Tigani requested a meeting with Star's Executive Vice President, Phyllis Valenti,[19] to discuss restoring WCW's original credit terms. Tigani, Anthony Bonavita (Star's then-Vice President of Sales) and Valenti met on January 18, 2017 (the "January 18 Meeting"). Valenti expressed that Star wanted WCW to place a few additional orders prior to revisiting WCW's payment terms.[20]

During the January 18 meeting, the parties also discussed transshipping. New York charges high excise taxes on alcohol, which results in New York wholesalers charging higher prices from New York retailers. Transshipping is the practice by which New York retailers come to Delaware to purchase alcohol to avoid paying the higher prices charged in New York due to the tax obligation.

---

[17] *Id.* at 2.
[18] JX 102.
[19] Am. Compl. ¶ 30.
[20] Op. Br. 28–29; Tr. Vol. II at 64:3–18.

4

Because the purpose of transshipping is to avoid taxes, the practice may expose involved parties to state and federal claims of tax evasion.[21]

The parties dispute the details of their transshipping discussion. Star alleges that Tigani explicitly stated that he was transshipping Georgi Vodka—Star's most popular product—into the State of New York.[22] Tigani denies admitting to personal involvement. Tigani testified that he "explained to [Valenti] that customers in Delaware have customers from out of state. And Delaware is the state that is the border state for sales of all types of products, like – including alcohol and it has been for a long time. And the customer that buys from Collins Park may not live in Delaware. That's not our job or even our concern...."[23]

Valenti demanded that WCW cease transshipping[24] due to her belief that it was illegal.[25] Valenti announced at the meeting that Star would raise its prices in Delaware to prevent transshipping.[26] WCW alleges that, in response, it requested

---

[21] Star is particularly concerned about its potential exposure to liability pursuant to 18 U.S.C. § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.").

[22] Tr. Vol. II at 69:16–18.

[23] Tr. Vol. I at 92:11–18.

[24] Tr. Vol. I at 92:2–3.

[25] The parties do not dispute that Valenti believed transshipping was illegal, though the parties dispute whether transshipping is indeed illegal. *Id.* at 92:16–18.

[26] Tr. Vol. I 92:9–93:13.

an opportunity to "buy-in" prior to any price increase. Star did not commit to permitting a buy-in at the lower prices.[27]

After the meeting, Star's counsel sent a letter to WCW's counsel demanding adequate assurance that WCW would cease "all sales of Star products to Delaware retailers that it knows or has reason to know, by virtue of the volume of sales in question or otherwise, that the Star products it is selling are intended to be resold or shipped outside the State of Delaware."[28] During this time, Valenti contemplated the transshipping issue as it related to the Delaware market.[29] Ultimately, WCW refused to provide assurances in response to Star's demand.[30]

On February 1, 2017, WCW submitted two purchase orders to Star.[31] The prices reflected the original prices, not the increased prices discussed at the January 18 Meeting, which were intended to put a halt to transshipping.[32]

From Star's perspective, filling these purchase orders meant knowingly participating in transshipping. Star felt it could not do so.[33] The next day, Star

---

[27] Op. Br. 30 ("Valenti's response to this request at the January 18 Meeting was non-committal and ultimately Star refused to place the buy-in order.").

[28] JX 52 at 2.

[29] Tr. Vol. II at 83:9–84:19 ("I realized that I had no business in Delaware.").

[30] JX 149.

[31] JX 178, 179.

[32] Tr. Vol. II at 211:13–212:8; *compare* JX 179 *with* JX 177.

[33] During trial, Valenti testified that she "could not be a party to transshipping. I found out. I could not be a part of it and I would not allow Star to be a part of that." Tr. Vol. II at 99:22–100:1.

surrendered its Delaware license.[34] The Deputy Commissioner of the Delaware Office of Alcoholic Beverage Control Commission ("OABCC") accepted the surrender without requiring any notice to WCW.[35]

In proceedings before the OABCC, WCW argued that Star's surrender "is constructive termination of their contract and inconsistent with Rule 901."[36] The Commissioner found "WCW's arguments to be without merit." The Commissioner held that "...the purpose of Rule 901 is to compensate a wholesaler for building a brand where another wholesaler in the state ultimately reaps the rewards of such building and labor..." but found that "[t]his present matter is not a scenario where Star's products are coming into Delaware through a different wholesaler while at the labor of WCW."[37]

The OABCC Commissioner held that, to the extent a distribution agreement existed, Star's surrender of its Delaware supplier's license was not a termination of the parties' relationship within the meaning of Rule 901. WCW did not appeal the ruling.

---

[34] JX 51.
[35] JX 104.
[36] JX 79 at 2.
[37] *Id.* ¶¶ 5–6.

7

### *Implied-in-Fact Distribution Agreement*

In its original complaint, WCW brought claims for breach of contract and promissory estoppel based on its contention that the parties entered into an oral exclusive distribution contract of indefinite term.[38] WCW alleged that "Star made clear and definite promises to WCW that WCW would be Star's exclusive wholesaler for an indefinite period of time."[39]

In its Post-Trial briefs, WCW amends its claims to alternatively argue that it had an implied-in-fact agreement or some combination of an oral and implied agreement pursuant to: (1) Delaware common law; and (2) the Delaware Uniform Commercial Code ("DUCC"). Star responds that not only is common law inapplicable to a sale of goods, but any such agreement is barred by the DUCC statute of frauds and otherwise fails for lack of any quantity of goods term.

### *Common Law*

WCW relies on *Pulieri v. Boardwalk Properties, LLC,*[40] which provides: "The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration."[41]

---

[38] Am. Compl. ¶ 2 ("In February 2014, WCW and Star entered into an oral agreement...by which Star appointed WCW, indefinitely, as its exclusive distributor of Star products in Delaware.").
[39] *Id.* at ¶ 127.
[40] 2015 WL 691449, at *7 (Del. Ch.).
[41] *Id.* at *6.

8

An implied-in-fact contract is "legally equivalent" to an express contract.[42] The common inquiry is "whether the parties have indicated their assent to the contract" and whether the parties demonstrated, through their actions "a meeting of the minds on all essential terms of the contract."[43]

Delaware law requires an "overt manifestation of assent—not subjective intent...."[44] "[T]he Court considers whether a reasonable person would conclude that the parties intended to be bound by examining the assent as well as all surrounding circumstances, including the course and substance of negotiations, prior dealings, customary practices in the trade, and the formality and completeness of the document" to determine whether overt manifestation of assent occurred.[45]

Industry custom, WCW argues, is particularly informative in this case. WCW claims that the implied-in-fact contract is an exclusive distribution agreement. Thus, WCW asserts that Delaware Administrative Code Title 4, Rule 901, provides insight into industry custom that should guide the Court's inquiry.

---

[42] *Ridely v. Bayhealth Medical Center, Inc.*, 2018 WL 1567609, at *7 (Del. Super.).
[43] *Id.* (internal citations omitted).
[44] *Grunstein v. Silva*, 2014 WL 4473641, at *30 (Del. Ch.) (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986)).
[45] *Gomes v. Karnell*, 2016 WL 7010912, at *3 (Del. Ch.) (citing *Leeds*, 521 A.2d at 1101); *see also Ridley*, 2018 WL 1567609, at *8; *Beta Data Services, Inc. v. Verizon Federal, Inc.*, 2014 WL 4219599, at *5 (Del. Super.); *BAE Sys. Info & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *4 (Del. Ch.).

The preamble to Rule 901 provides:

Historically, in Delaware the distribution of particular brands of alcoholic beverages has been accomplished through dealings between an out-of-state supplier…licensed to supply alcoholic beverages into Delaware and one Delaware wholesaler…licensed to sell and distribute alcoholic beverages to Delaware retailers. These exclusive relationships between suppliers and wholesalers have, through the years, proven to be an efficient and economical means of distribution in Delaware. Until recently such exclusive relationships had been utilized to the virtual exclusion of other methods of distribution. Today, exclusivity remains the preferred method of distribution for the vast majority of brands being sold in Delaware.

Over the years, in reliance on the *supplier's custom and practice of establishing and maintaining exclusive distribution relationships*, Delaware wholesalers have made substantial investments of time and money in efforts to promote and sell suppliers brands. As early as 1959, the Commissioner realized that some safeguards were necessary to protect wholesalers from arbitrary, discriminatory or otherwise unfair termination of the supplier/wholesaler relationship by national or international suppliers wielding far greater economic power than the local wholesalers.[46]

WCW refers to Section 4.1 of Rule 901, which provides: "Contracts involving the distribution of alcoholic beverages in Delaware between a licensed out-of-state supplier and a licensed wholesaler may be written *or oral*."[47] Section 4.4 further provides: "Every contract for the distribution of alcoholic beverages in Delaware between a licensed out-of-state supplier and a licensed wholesaler shall contain, or be deemed to contain, all of the provisions of this Rule."[48]

---

[46] 4 Del. Admin. C. § 901 at 1.0 (Preamble) (emphasis added).
[47] *Id.* § 4.1 (emphasis added).
[48] *Id.* § 4.4.

10

Star responds that WCW presented no evidence at trial to support the existence of an oral agreement as it pled in its complaint. The evidence at trial showed that, in fact, Star did not have a distribution agreement with any of its distributors in any state except in those states where an agreement is required by law.[49] Star also insists that the parties never discussed the duration of any distribution agreement[50] despite WCW's insistence that it was indefinite. Thus, Star argues that WCW's alleged agreement fails the Delaware statute of frauds requirement of a written contract for multiple years.[51]

As for an implied-in-fact contract, Star argues WCW relies on irrelevant common law. WCW specifically stated that "[t]he implied exclusive distribution agreement at issue here falls squarely within Article 2 of the DUCC insofar as it predominantly involved the sale of 'goods' and 'future goods' as defined in 6 *Del. C.* [Sections] 2-105(1) & (2)."[52] Star argues that "[b]ecause the sale was a transaction in goods, Article 2 of Delaware's UCC controls."[53] Thus, Star contends

---

[49] Tr. Vol. II at 11:13–15.

[50] *Id.* at 10:12–11:7.

[51] 6 *Del.* C. § 2714 (No action shall be brought to charge any person…upon any agreement that is not to be performed within the space of 1 year from the making thereof…unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith…."); *but see Dweck v. Nasser,* 2010 WL 972780, at *2 (Del. Ch.) (citing *Havef Corp. v. Guyer,* 211 A.2d 910, 912–13 (Del. 1965) ("It has been the law in Delaware for many years that the Statute of Frauds does not apply to a contract which may, by any possibility, be performed within a year.")).

[52] Op. Br. at 14.

[53] *Lee ex rel. B.L. Picture People, Inc.,* 2012 WL 1415471, at *4 (Del. Super.) (referring to 6 *Del.* C. § 2-102 ("[T]his Article applies to transactions in goods.")).

11

that WCW cannot pick and choose which UCC provisions govern the alleged contract.

*Delaware Uniform Commercial Code*

DUCC Section 1-201 defines "Agreement" as the "bargain of the parties in fact, as found in their language or *inferred* from other circumstances, including course of performance, *course of dealing, or usage of trade* as provided in Section 1-303."[54]

Section 1-303 defines "course of dealing" as a "sequence of conduct concerning *previous* transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."[55] WCW argues that its previous transactions with Star formed a binding agreement under the DUCC because they established expectations of exclusivity and continued performance.

"Usage of trade" is "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify expectation that it will be observed with respect to the transaction in question."[56] WCW argues that its alleged agreement could be found binding based on trade practices in the

---

[54] 6 *Del.* C. § 1-303 (emphasis added).
[55] *Id.* § 1-303(a) (emphasis added).
[56] *Id.*; *see also Mine Safety Appliances Co. v. AIU Ins. Co.*, 2015 5829461, at *7 (Del. Super.) ("In order for course of conduct evidence to be relevant, the conduct must involve the same parties and the same contract.").

alcohol wholesaler industry. WCW asserts that exclusive distribution contracts customarily are made orally.

WCW also relies on Section 2-204, which provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."[57] Even if "one or more terms are left open a contract for sale does not fail for indefiniteness...."[58]

Star argues that the alleged agreement fails to comply with the DUCC statute of frauds. Star asserts that the DUCC imposes substantively different requirements on sale of goods contracts from those of Delaware's general statute of frauds. Section 2-201(1) of the DUCC requires:

> [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.[59]

Star asserts that there is no "writing sufficient to indicate that" the parties had an exclusive distribution agreement in perpetuity, let alone one signed by

---

[57] *Id.* § 2-204(1).
[58] *Id.* § 2-204(3).
[59] 6 *Del.* C. § 2-201(1).

13

Star.[60] Thus, Star argues that the alleged agreement for any future performance is not enforceable under the DUCC.[61]

WCW refers to Valenti's testimony that payment terms governing the distribution relationship were communicated and memorialized in different written memoranda. According to Valenti, WCW would deliver a written purchase order to Star.[62] Valenti also stated that bills of lading reflected the "name of the distributor" and "every item that [the distributor] is picking up by size," as well as the "total [number] of how many cases [the distributor] picked up."[63] In addition, invoices provided the "dollar amount due."[64] WCW argues that these written memoranda satisfy its burden to show "some writing."

According to Section 2-201, individual shipment orders cannot create or substantiate an ongoing distribution commitment.[65] Comment 2 to Section 2-201 provides: "'Partial Performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted."[66] Thus, Star contends that WCW cannot

---

[60] *See* 6 *Del.* C. § 2-201(1).
[61] *See Tecot Elec. Supply Co. v. Skipper's Elec., Inc.*, 2009 WL 51551, at *3 (Del. Ct. Com. Pl.) (oral agreement for the sale of goods held not enforceable because it was in excess of $500).
[62] Tr. Vol. II at 24:14–15.
[63] *Id.*
[64] *Id.*
[65] 6 *Del.* C. § 2-201(1) cmt. 2.
[66] *Id.*

14

rely on fulfilled purchase orders to satisfy the Section 2-201 "some writing" requirements.

Star further argues that even if WCW could prove the existence of writing demonstrating a distribution agreement, the absence of any quantity of goods term renders any such agreement unenforceable.

In response to Star's insistence that the absence of a material term is dispositive of WCW's case, WCW offers *Pennzoil Co. v. Getty Oil, Co.*[67] In *Pennzoil*, the Court of Chancery held that under Section 2-204(3),[68] "a contract for sale does not fail for indefiniteness if terms, *even important terms*, are left open" so long as the parties intended to contract and an appropriate remedy may be fashioned.[69]

Although "[t]he required writing need not contain all the material terms of the contract" the DUCC clarifies that "[t]he only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated."[70] Here, Star argues, no such quantity term has been specified, thus

---

[67] 1984 WL 15664 (Del. Ch.).

[68] 6 *Del.* C. § 2-204(3) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.").

[69] *Pennzoil*, 1984 WL 15664, at *13–14 (quoting *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 363 N.E.2d 701 (1977)) (emphasis added); *see also Miller v. Newsweek, Inc.*, 660 F.Supp. 852, 856 (D. Del. 1987) (finding that a single telephone conversation between the parties created a valid and binding oral contract pursuant to Section 2-204).

[70] 6 *Del.* C. § 2-201, cmt. 1.

any alleged agreement is unenforceable.[71] Star asserts that WCW has not claimed, and did not offer any evidence at trial, that its alleged distribution agreement with Star contained any quantity term at all.

The Court finds that under DUCC Section 2-201, a specific quantity provision is necessary for an enforceable agreement. The facts presented at trial fail to demonstrate agreement on any quantity. A written purchase order and partial performance are not sufficient to obligate Star to WCW's exclusive distribution in perpetuity on the basis of an oral contract or an implied-in-fact distribution agreement. Therefore, the DUCC statute of frauds prevents recovery on these facts.

### *Notice of License Surrender*

WCW argues that Star was required to provide notice before surrendering its Delaware supplier license. "Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."[72] WCW asserts that Star breached its obligation to act in good faith in its performance when it failed to provide notice before surrendering its Delaware supplier license.

---

[71] *J.C. Trading Ltd. v. Walmart Stores, Inc.*, 947 F.Supp.2d 449, 460 (D. Del. 2013) (finding plaintiff's breach of contract claim failed under the DUCC because "substantial quantities" is "fatally indefinite" and renders the agreement "illusory and, therefore, unenforceable").
[72] 6 *Del.* C. §1-304.

16

WCW relies on DUCC Section 2-309, which provides:

(2) *Where the contract provides for successive performances but is indefinite in duration* it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party. (3)Termination of a contract by one party except on the happening of an agreed event *requires* that *reasonable notification* be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.[73]

It is uncontested that the alleged agreement involved an indefinite duration. WCW asserts that the agreement involved "successive performances" during the nearly three years that the agreement was in place. WCW argues that the agreement called for successive performances on an order-by-order basis, as market demand warranted. Thus, WCW argues that Section 2-309 governs the agreement, requiring reasonable notification of termination.

In September 2016, there was a change in the parties' course of business. WCW failed to comply with previously agreed-upon financial obligations. Star refused to sell any more products to WCW until WCW paid its entire account balance to zero.[74] After WCW resolved the account issue by paying the previous balance,[75] the parties reached a new agreement. The parties agreed that WCW would change from 30-day payment terms to a cash-on-delivery system. The new arrangement required WCW to submit a purchase order and pay for the inventory

---

[73] 6 *Del.* C. §2-309(2) & (3) (emphasis added).
[74] Tr. Vol. I at 80:12—80:19
[75] *Id.* at 84:17—85:3

17

two days in advance.[76] WCW admits that these terms were unusual for the industry because of the restrictions.[77] The new payment terms essentially created a transaction-by-transaction course of dealing.

It is undisputed that Star voluntarily surrendered its supplier license without notice.[78] WCW argues that DUCC Section 2-309(3) required Star to provide reasonable notice of its license surrender because it effectively terminated their agreement. WCW concedes that "[t]he court may determine the "reasonable notice" inquiry as a matter of law."[79]

Star contends that it was not required to give notice under the OABCC rules. OABCC Rule Section 902 does not require a supplier to provide notice before surrendering its license.[80] Following Star's surrender of its supplier license, the OABCC affirmatively accepted the surrender and determined that there was no reason to reject it or hold it in abeyance.[81]

Star also contends that even if the OABCC rules did not govern the transaction, DUCC Section 2-309(2) does not apply. Star relies on *International Business Machine Corp. v. Fasco Industries* to illustrate that

---

[76] *Id.* at 88:4–88:17
[77] *Id.* at 85:4–86:2
[78] Tr. Vol. II at 148:3–148:6
[79] *Id.*
[80] *See* 4 Del. Admin. C. § 700 at 9 ("[N]othing in this Rule shall prohibit a licensee from surrendering the license or allowing it to expire.").
[81] JX 79 at 3.

18

single purchase orders should not be considered "successive performances." In that case, the United States District Court for the Northern District of California held that Section 2-309(2) does not apply to single purchase orders, where each time a purchase order was filled, the corresponding payment was made.[82]

Star further argues that surrender of its license was justified because WCW repudiated the contract when it failed to provide adequate assurance that transshipping would cease. According to DUCC Section 2-609:

> (1)When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance....
>
> (4) After receipt of a justified demand failure to provide . . . such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.[83]

In response, WCW contends that Star did not have reasonable grounds for insecurity. WCW asserts that Star surrendered its supplier license because it believed transshipping was illegal. WCW argues that these grounds are unreasonable because Star had reason to know transshipping was taking place.

The parties dispute whether transshipping is illegal. The Court declines to address the legality of transshipping, and need not resolve this issue. The Court need not decide whether Star had or should have had specific knowledge that

---

[82] 1995 WL 110557, at *2 (N.D. Cal. 1995)
[83] 6 *Del.* C. §2-609(1),(4)

19

WCW was transshipping, or whether WCW actually actively participated in transshipping at all.

The Court finds that the trial evidence shows that WCW sales reflected that transshipping to NY was occurring. The trial evidence also shows that Star, at the very least, viewed transshipping as contrary to its business interests.[84] Star requested assurances that the practice would cease.[85] WCW refused to provide the requested assurances.[86]

The Court finds that the request for assurances was reasonable in light of the effect transshipping had on Star's business interests. WCW failed to provide the requested adequate assurances, resulting in repudiation.

Under the facts presented at trial, notice of license surrender was not required. The parties established a new payment procedure requiring cash-on-delivery. Therefore, there was no agreement for successive performances of unlimited duration. The Court finds that the change to the parties' course of business repudiates successive performances that would require reasonable notification under DUCC Section 2-309. Therefore, the Court finds that the surrender of Star's Delaware supplier license was neither breach nor termination.

---

[84] Tr. Vol. II 69:16–70:9 ("I don't want you doing this…I have a wholesaler in New York….")
[85] Tr. Vol. II 77:9–78:18 ("Star accordingly demands that World Class agrees to immediately cease all sales of Star products to Delaware retailers that it knows or has reason to know…that the Star products it is selling are intended to be resold and shipped.").
[86] *Id.* ("He wouldn't give the assurance.").

20

### *Promissory Estoppel*

WCW alternatively pled promissory estoppel under Count III of its

Amended Complaint. The Delaware Supreme Court has held:

> To prevail on a promissory estoppel claim, a plaintiff must establish that: (1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise; (3) the promise reasonably relied on the promise and took action or refrained from taking action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise.[87]

To prove that a promise was made, WCW must establish by clear and

convincing evidence more than "[m]ere expressions of opinion, expectation or

assumption...."[88]

Star contends that WCW presented no evidence at trial to prove any such

promise. Star asserts that Tigani's testimony lacked any allegations that Star made

a promise,[89] whereas Valenti testified she never made any promise to *any*

distributors.[90]

Tigani testified that he formed an expectation of "complete commitment"

based on Star's choice to use only one Delaware distributor in the context of his

"experience" in the business.[91] WCW does not specify any evidence or testimony

---

[87] *Harmon v. State*, 62 A.3d 1198, 1200–01 (Del. 2013).
[88] *Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del. Super. 1979).
[89] Tr. Vol. I at 27:20–28:17.
[90] Tr. Vol. II at 11:19–22.
[91] Tr. Vol. I at 27:20–28:17.

submitted during trial[92] beyond Tigani's personal beliefs regarding the parties' relationship.

Considering the evidence at trial, the Court finds that WCW failed to produce any evidence that Star agreed that WCW would be Star's exclusive Delaware wholesaler for an indefinite period of time. Tigani's subjective expectations are insufficient to establish that Star made a promise. Therefore, WCW's promissory estoppel claim must fail.

### *Unjust Enrichment*

On Star's motion to dismiss, the Court dismissed in part Count IV – Unjust Enrichment, leaving one issue for trial: a $50,000 payment allegedly made at Star's request and on Star's behalf.[93]

To prove unjust enrichment, WCW must show: (1) an enrichment; (2) an impoverishment; (3) relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provision provided by law.[94]

WCW asserts that it presented evidence at trial demonstrating the existence of each element of unjust enrichment. WCW refers to the promissory note it

---

[92] Op. Br. at 35 ("WCW *will* prove the following at trial: Star made clear and definite promises for an indefinite period of time.") (emphasis added).
[93] *World Class Wholesale, LLC v. Star Indus., Inc.*, 2018 WL 2331991, at *2 (Del. Super.).
[94] *Id.* (citing *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

22

entered with Global which memorialized an agreement whereby WCW would pay Global $50,000.[95] WCW has paid approximately $15,000 on the note.[96] WCW asserts that the note was assumed for Star, and thus argues WCW was unjustly impoverished to the benefit of Star.

Star asserts that the evidence at trial failed to prove that Star promised to reimburse WCW for its agreement with Global. Star insists that not only was it not a party to the agreement between Global and WCW, but it had no involvement in WCW's decision to purchase Global's distribution rights. Star asserts that WCW never even asked Star to pay the note. Thus, Star argues, it has no responsibility for WCW's note or its agreement with Global.

Further, Star contends that even if WCW could prove that Star was *enriched* by the note, there is no dispute that WCW has not paid the full amount due on the note. Star also asserts that the remaining balance due is WCW's own fault. Star insists that if WCW had adhered to its contract with Global to pay 2 percent on sales of Star products,[97] WCW would have paid nearly the entire note prior to Star's departure from the Delaware market.

The Court finds that there is no evidence that Star promised to reimburse WCW for WCW's agreement to pay Global for distribution rights. Even if WCW

---

[95] Tr. Vol. I at 14–16, 21–22; JX–2.
[96] *Id.* at 125–26.
[97] JX 2; Tr. Vol. I at 14:15–15:16.

could prove Star's liability, the Court finds that WCW has not paid to Global the $50,000 that WCW now attempts to recover from Star.

## CONCLUSION

Having considered all evidence presented at trial, the Court finds that no implied-in-fact distribution agreement or oral contract existed between WCW and Star for distribution rights in perpetuity. Thus, there was no contract pursuant to which a duty of good faith and fair dealing could have been breached.

Additionally, Star's surrender of its Delaware Supplier License was neither a breach nor termination of any agreement.

Having found that no exclusive distribution agreement existed or was breached, WCW's promissory estoppel claim must be dismissed.

Finally, WCW has failed to prove unjust enrichment.

**THEREFORE**, the Court hereby renders a verdict after trial in favor of Defendant Star Industries, Inc.

**IT IS SO ORDERED.**

The Hon. Mary M. Johnston

24